UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

SAM BERNARD LUCCHESE, III,                    CASE NO. 15-01781-5-SWH
                                              CHAPTER 13

        DEBTOR

## OBJECTION TO CLAIM

        Now comes the debtor, by and through undersigned counsel, and objects to Court
Claim #11 filed by Selene Finance, LP ("creditor"), in the total amount of $571,061.37
and shows the Court as follows:

        1.      Court Claim #11 asserts an amount of arrears of $94,978.48 and ongoing
payments at the monthly rate of $2,960.25 including $2,007.07 principal and interest and
$953.19 escrow. A copy of the claim is attached as Exhibit A.

        2.      The debtor objects to Part 2 of Form B 10A in which the creditor includes
amounts for numerous prepetition fees, expenses, and charges. The debtor does not recall
whether he received proper notice of these fees and contends that the creditor did not
comply with the provisions of N.C. Gen. Stat. § 45-91 regarding the assessment of the
fees, expenses, and charges itemized in its claim for those fees, expenses, and charges
assessed after the effective date of the statute of January 1, 2009 and before the petition
date.

        3.      It is undisputed that the creditor is a "servicer" of a "home loan" for the
purposes of N.C. Gen. Stat. § 45–90(1), and is therefore subject to the notice
requirements of N.C. Gen. Stat. § 45–91.

        4.      The creditor provides no evidence that documentation was provided to the
debtor regarding the fees claimed. Thus, pursuant to N.C. Gen. Stat. § 45–91, and *In re
Smith*, No. 08-07636-8-JRL, 2012 WL 5462850 (Bankr. E.D.N.C. Nov. 8, 2012), the
creditor is deemed to have waived the prepetition mortgage fees, expenses, and charges
incurred after January 1, 2009. If the creditor produces evidence that proper notice was
provided, then the debtor will withdraw this portion of the objection.

        5.      Under N.C. Gen. Stat. § 45–90 *et seq.* the debtor does not object to the
escrow shortage amount on line 13 of Part 2 of Form B 10A or the $250.00 fee indicated
on page 7 of 41 of the claim.

        6.      Additionally, the debtor notes that he filed this case on April 1, 2015 and
pre-petition he and his wife entered into a loan modification process with Selene. *See*

Exhibit B attached hereto for copies of the relevant documents. The debtor would like to request an update from Selene on the loan modification.

WHEREFORE, the debtor prays that the said Court Claim #11 filed by Selene Finance, LP be disallowed as filed without prejudice to an amended proof of claim being filed that is consistent with the debtor's objection set forth above, and that he have such other and further relief as is just.

Dated: September 24, 2015.

SASSER LAW FIRM

By: s/ Travis Sasser
Travis Sasser, State Bar No. 26707
2000 Regency Parkway, Suite 230
Cary, N.C. 27518
Tel: 919.319.7400
Fax: 919.657.7400

B 10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF NORTH CAROLINA | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor: Sam Bernard Lucchese, III | Case Number: 15-01781-5-SWH |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Selene Finance, LP Servicer for Christiana Trust, A Division of Wilmington Savings Fund Society, FSB, as Trustee for Normandy Mortgage Loan Trust, Series 2013-10

**COURT USE ONLY**

Name and address where notices should be sent:

Selene Finance, LP
9990 Richmond Avenue
Suite 400S
Houston, Texas 77042

☐ Check this box if this claim amends a previously filed claim

**Court Claim Number:** _____
(If known)

Filed on: _____

Telephone number:                    Email:

Name and address where payment should be sent (if different from above):
Selene Finance, LP
PO Box 71243
Philadelphia, PA 19176

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:                    Email:

**1. Amount of Claim as of Date Case Filed:**         $571,061.37

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitle to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Money Loaned
(see instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** XXXXXX0865

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):** _____
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☒ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: 2904 Lake Boone Place, Raleigh, NC 27608

**Value of Property:** _____

**Annual Interest Rate** 5% ☒ Fixed   or   ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**         $94,978.48

**Basis for perfection:** Secured by the Note and Deed of Trust for 2904 Lake Boone Place, Raleigh, NC 27608

**Amount of Secured Claim:**         $571,061.37

**Amount of Unsecured Claim:**         $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*), earned within 180 days before the case was filed or debtor's business ceased, whichever is earlier -- 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan -- 11 U.S.C. §507(a)(5).

**Amount entitled to priority:**

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8).

☐ Other -- Specify applicable paragraph of 11 U.S.C. §507(a)(____).

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.



EXHIBIT
A

B 10 (Official Form 10) (4/13)

---

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

---

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of document providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7 and definition of "redacted")*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

---

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor    ☒ I am the creditor's authorized agent    ☐ I am the trustee, or the debtor, or    ☐ I am a guarantor, surety,
                                                                     their authorized agent.              indorser, or other codebtor.
                                                                     (See Bankruptcy Rule 3004.)          (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Alison H. Wadsworth,

Title:          Attorney
                                                                    _s/Alison H. Wadsworth_     August 3, 2015
Company:  SHAPIRO & INGLE                                            (Signature)                 (Date)

Address and telephone number if different from notice address above):

10130 Perimeter Parkway
Suite 400
Charlotte, NC 28216
(704)333-8107        Fax: (704)333-8156

Telephone number:            email: ncbkmail@shapiro-ingle.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

B 10A (Attachment A) (12/11)
## Mortgage Proof of Claim Attachment

If you filed a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See Bankruptcy Rule 3002.1

**Name of debtor:** Sam Bernard Lucchese, III

**Case Number:** 15-01781-5-SWH

**Name of creditor:** Christiana Trust, A Division of Wilmington Savings Fund Society, FSB, as Trustee for Normandy Mortgage Loan Trust, Series 2013-10

**Last four digits of any number you use to identify the debtor's account:** XXXXXX0865

### Part 1: Statement of Principal and Interest Due as of the Petition Date

Itemize the principal and interest due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. | Principal due | | | | | | (1) | $481,694.38 |

| 2. | Interest Due | Interest rate | From mm/dd/yyyy | To mm/dd/yyyy | Amount | | | |
|---|---|---|---|---|---|---|---|---|
| | | 5% | 03/01/2013 | 04/01/2015 | $50,284.38 | | | |

| | | Total interest due as of the petition date | $50,284.38 | Copy total here ▶ | (2) | $50,284.38 |
|---|---|---|---|---|---|---|

| 3. | Deferred Interest Due | | | | | | (3) | + $0.00 |
|---|---|---|---|---|---|---|---|---|

| 4. | Total principal, interest, and deferred interest due | | | | | | (4) | $531,978.76 |
|---|---|---|---|---|---|---|---|---|

### Part 2: Statement of Prepetition Fees, Expenses, and Charges

Itemize the fees, expenses and charges due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

| | Description | Dates Incurred | | Amount |
|---|---|---|---|---|
| 1. | Late charges | 04/16/2011, 05/16/2011, 06/16/2011, 07/16/2011, 08/16/2011, 09/16/2011, 10/16/2011, 11/16/2011, 12/16/2011, 01/16/2012, 02/16/2012, 03/16/2012, 04/16/2012, 05/16/2012, 06/16/2012, 07/16/2012, 08/16/2012, 09/16/2012, 10/16/2012, 11/16/2012, 12/16/2012, 01/16/2013, 02/16/2013, 03/16/2013, 04/16/2013, 05/16/2013, 06/16/2013, 07/16/2013, 08/16/2013, 09/16/2013, 10/16/2013, 11/16/2013, 12/16/2013, 01/16/2014, 02/16/2014, 03/16/2014, 04/16/2014, 05/16/2014, 06/16/2014, 07/16/2014, 08/16/2014, 09/16/2014, 10/16/2014, 11/16/2014, 12/16/2014, 01/16/2015, 02/16/2015, 03/16/2015 | (1) | $3,818.21 |
| 2. | Non-sufficient funds (NSF) fees | | (2) | $0.00 |
| 3. | Attorney's fees | 01/20/2015 | (3) | $135.00 |
| 4. | Filing fees and court costs | 01/20/2015 | (4) | $175.00 |
| 5. | Advertisement costs | | (5) | $0.00 |
| 6. | Sheriff/auctioneer fees | | (6) | $0.00 |

| | | | | |
|---|---|---|---|---|
| 7. | Title costs | | (7) | $0.00 |
| 8. | Recording fees | | (8) | $0.00 |
| 9. | Appraisal/broker's price opinion fees | | (9) | $0.00 |
| 10. | Property inspection fees | 07/10/2014, 08/27/2014, 09/30/2014, 11/07/2014, 12/03/2014, 01/22/2015, 03/11/2015 | (10) | $73.50 |
| 11. | Tax advances (non-escrow) | | (11) | $0.00 |
| 12. | Insurance advances (non-escrow) | | (12) | $0.00 |
| 13. | Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | | (13) | $9,151.00 |
| 14. | Property preservation expenses. Specify: _____ | | (14) | $0.00 |
| 15. | Post-petition pre-confirmation BK attorney fees (Bankruptcy post-petition pre confirmation attorneys fees-The attorneys fees were incurred for reviewing the schedules, reviewing the plan, preparation of the proof of claim, review of loan documents, determination as to whether the creditor's rights are materially affected by the proposed plan, and advising the creditor of any further action necessary to protect its rights in the bankruptcy case.) | | (15) | $0.00 |
| 16. | Other. Specify: ACQC ACQ Conversion | 06/06/2014 | (16) | $2,093.13 |
| 17. | Total prepetition fees, expenses, and charges.  Add all of the amounts listed above. | | (17) | $15,445.84 |

## Part 3:  Statement of Amount Necessary to Cure Default as of the Petition Date

Does the installment payment amount include an escrow deposit?

☐ No.

☒ Yes.  Attach to the Proof of Claim form an escrow account statement prepared as of the petition date in a form consistent with applicable nonbankruptcy law.

| | | | |
|---|---|---|---|
| 1. Installment payments due | Date last payment received by creditor | | February 13, 2015 |
| | Number of installment payments due | | 25 |
| 2. Amount of installment payments due | 11 installments @ $2,909.74 From April 1, 2013 to February 1, 2014 | + | $32,007.14 |
| | 9 installments @ $2,909.75 From March 1, 2014 to November 1, 2014 | + | $26,187.75 |
| | 5 installments @ $4,267.55 From December 1, 2014 to April 1, 2015 | + | $21,337.75 |
| | Total installment payments due as of the petition date | $79,532.64    Copy total here ▶ (2) | $79,532.64 |

Case 15-01781-5-SWH    Claim 11    Filed 08/04/15    Desc Main Document      Page 5 of 41

**3. Calculation of cure amount**

| | | | |
|---|---|---|---|
| <u>Add</u> total prepetition fees, expenses, and charges | Copy total from Part 2 here ▶ | + | $15,445.84 |
| <u>Subtract</u> total of unapplied funds (funds received but not credited to account) | | - | $0.00 |
| <u>Subtract</u> amounts for which debtor is entitled to a refund | | - | $0.00 |
| Total amount necessary to cure default as of the petition date | (3) | | $94,978.48 |

Copy total onto Item 4
of Proof of Claim form

# United States Bankruptcy Court

Eastern District of North Carolina, Raleigh Division

## EXHIBIT 'A'

| | | | |
|---|---|---|---|
| In Re: | Sam Bernard Lucchese, III | | |
| Principal Balance: | $481,694.38 | BK Case #: | 15-01781-5-SWH |
| Pre-Petition Payments Due From: | April 1, 2013 | Date on POC: | August 3, 2015 |
| Client: | Christiana Trust, A Division of Wilmington Savings Fund Society, FSB, as Trustee for Normandy Mortgage Loan Trust, Series 2013-10 | | |

## TOTAL DEBT

| | | |
|---|---|---|
| Principal Balance | = | $481,694.38 |
| Interest Due | = | $50,284.38 |
| Deferred Interest Due | = | $0.00 |
| Late Charges | = | $3,818.21 |
| Non-sufficient funds (NSF) fees | = | $0.00 |
| Attorney's fees | = | $135.00 |
| Filing fees and court costs | = | $175.00 |
| Advertisement costs | = | $0.00 |
| Foreclosure service fees | = | $0.00 |
| Title costs | = | $0.00 |
| Recording fees | = | $0.00 |
| Appraisal/broker's price opinion fees | = | $0.00 |
| Property inspection fees | = | $73.50 |
| Tax advances (non-escrow) | = | $0.00 |
| Insurance advances (non-escrow) | = | $0.00 |
| Escrow Advance | = | $32,787.77 |
| Property preservation expenses. Specify: _____ | = | $0.00 |
| Other. Specify: Mail | = | $0.00 |
| Other. Specify: ACQC ACQ Conversion | = | $2,093.13 |
| Other. Specify: | = | $0.00 |
| Escrow Balance | = | $0.00 |
| Pro Rata MIP/PMI | = | $0.00 |
| Suspense Amount | = | $0.00 |
| TOTAL DEBT | = | $571,061.37 |

**PAYMENT BREAKDOWN EFFECTIVE:** May 1, 2015
**PRINCIPAL & INTEREST:** $2,007.07
**ESCROW:** $953.19
**TOTAL PAYMENT:** $2,960.26

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:

| | |
|---|---|
| **SAM BERNARD LUCCHESE, III** | **15-01781-5-SWH** |
| **DEBTOR(S)** | **CHAPTER 13** |


## FEE ASSESSMENT STATEMENT

Re:    Loan#:  XXXXXX0865
        Address:  2904 Lake Boone Place, Raleigh, NC 27608
        Lender:  Selene Finance, LP

This Statement shall serve as notice pursuant to NCGS Sec. 45-91 that Selene Finance, LP has incurred a fee which will be assessed to your loan as follows:

<u>Date</u>:  August 3, 2015

<u>Amount</u>: $250.00

<u>Description</u>:  Post-Petition/Pre-Confirmation Bankruptcy Attorneys Fees for the preparation of Proof of Claim, Review of Schedules, Review of Loan Documents, and Review of Plan.

This information is provided for informational purposes, if and to the extent, N.C. Gen. Stat. 45-91 applies and to preserve the creditor's right to seek and collect its attorney's fees described herein.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

**SAM BERNARD LUCCHESE, III**    **15-01781-5-SWH**
**DEBTOR(S)**        **CHAPTER 13**

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing and annexed pleading or paper upon:

(Served via U.S. Mail)
Sam Bernard Lucchese, III
514 Daniels Street #263
Raleigh, NC 27605
(Served via Electronic Notification Only)

Travis Sasser
2000 Regency Parkway, Suite 230
Cary, NC 27518
(Served via U.S. Mail and Electronic Notification)

John F. Logan
Office Of The Chapter 13 Trustee
PO Box 61039
Raleigh, NC 27661

by depositing the same in a postpaid wrapper properly addressed to each such party or his attorney of record in a post office or other official depository under the exclusive care and custody of the United States Postal Service and/or by electronic mail, if applicable.

This August 4, 2015.

*/s/Alison H. Wadsworth*
Alison H. Wadsworth
SHAPIRO & INGLE, L.L.P.
10130 Perimeter Parkway, Suite 400
Charlotte, NC 28216
704/333-8107

06-79039

**S**ELENE ®
**F**INANCE

9990 Richmond, Suite 400 South
Houston, TX 77042-4546

**ANNUAL ESCROW ACCOUNT**
**DISCLOSURE STATEMENT**

LOAN NUMBER:
DATE:  April 9, 2015

| | Previous Payment | New Payment Effective 05/01/15 |
|---|---|---|
| PRINCIPAL AND INTEREST | $2,007.07 | 2,007.07 |
| ESCROW | $902.67 | 953.19 |
| TOTAL PAYMENT | $2,909.74 | 2,960.26 |

SAM B LUCCHESE
JENNIFER W LUCCHESE
2904 LAKE BOONE PL
RALEIGH NC  27608-1151

CUSTOMER SERVICE  877-735-3637

**COMING YEAR ESCROW PROJECTION**

The purpose of the Coming Year Escrow Projection is to determine the lowest balance "Low Point" to which your escrow account will decline over the upcoming year. The purpose of the Low Balance Summary is to compare the projected and allowable low point amounts. If the projected low point is greater than the allowable low point (*), there is a surplus. If the surplus is $50.00 or greater, it will be automatically refunded to you. If the surplus is less than $50.00, we have lowered your payment accordingly. If the projected low point is less than the allowable low point(*), there is a shortage and/or deficiency which will be recovered by an adjustment to your monthly payment over a specified number of months. The adjustment amount(s) appears in the Low Balance Summary and New Payment information.

| ANTICIPATED ESCROW DISBURSEMENT | | MONTH | PAYMENTS TO ESCROW | DESCRIPTION | PAYMENTS FROM ESCROW | CUR BAL PROJECTION | REQ BAL PROJECTION |
|---|---|---|---|---|---|---|---|
| HAZARD INS | 2,291.00 | | | BEGINNING BALANCE | | -3,431.88 | 5,719.12 |
| COUNTY TAX | 9,147.26 | 05/15 | 953.19 | | .00 | -2,478.69 | 6,672.31 |
| | | 06/15 | 953.19 | HOME INS | 2,291.00 | -3,816.50 | 5,334.50 |
| | | 07/15 | 953.19 | | .00 | -2,863.31 | 6,287.69 |
| | | 08/15 | 953.19 | | .00 | -1,910.12 | 7,240.88 |
| | | 09/15 | 953.19 | | .00 | -958.93 | 8,194.07 |
| TOTAL DISBURSEMENTS | 11,438.26 | 10/15 | 953.19 | | .00 | -3.74 | 9,147.26 |
| DIVIDED BY 12 MONTHS | | 11/15 | 953.19 | | .00 | 949.45 | 10,100.45 |
| | | 12/15 | 953.19 | CNTY ANN 1 P | 9,147.26 | -7,244.62 | 1,906.38 * |
| MONTHLY ESCROW DEPOSIT | 953.19 | 01/16 | 953.19 | | .00 | -6,291.43 | 2,859.57 |
| | | 02/16 | 953.19 | | .00 | -5,338.24 | 3,812.76 |
| | | 03/16 | 953.19 | | .00 | -4,385.05 | 4,765.95 |
| LOW BALANCE SUMMARY | | 04/16 | 953.19 | | .00 | -3,431.86 | 5,719.14 |
| PROJECTED LOW POINT | -7,244.62 | TOTAL | 11,438.26 | | 11,438.26 | | |
| ALLOWABLE LOW POINT | 1,906.38 | | | | | | |

**The cushion allowed by federal law (RESPA) is two times your monthly escrow payment (excluding MIP/PMI), unless state law specifies a lower amount.**

**IMPORTANT MESSAGES**

PLEASE RETURN LOWER PORTION WITH YOUR PAYMENT AND KEEP THE TOP PORTION FOR YOUR RECORDS
**INTERNET REPRINT**

Loan Number: ████████████

**ESCROW ACCOUNT HISTORY**

Date: April 9, 2015

♦ This statement itemizes your actual escrow account transactions since your previous analysis statement or initial disclosure. The projections from your previous escrow analysis are to the left of the actual payments, disbursements and escrow balance. By comparing the actual escrow payments to the previous projections listed, you can determine where a difference may have occurred.

♦ An asterisk (*) indicates a difference from the projected activity in either the amount or date.

♦ When applicable, the letter "E" beside an amount indicates that a payment or disbursement has not yet occurred but is estimated to occur as shown.

♦ Your projected low point may or may not have been reached based on one or more of the following factors:

| PAYMENT(S) | TAXES | INSURANCE |
|---|---|---|
| • Monthly payment(s) received earlier OR later than expected | • Tax rate and/or assessed value changed | • Premium changed |
| • Monthly payment(s) received were less than OR greater than expected | • Exemption status lost or changed | • Coverage changed |
| • Previous overage was returned to escrow | • Supplemental/Delinquent tax paid | • Additional premium paid |
| • Previous shortage not paid entirely | • Tax bill paid earlier OR later than expected | • Insurance bill paid earlier OR later than expected |
| | • Tax installment not paid | • Premium was not paid |
| | • Tax refund received | • Premium refund received |
| | • New tax escrow requirement paid | • New insurance escrow requirement paid |
| | | • Lender placed insurance premium paid |

| MONTH | PAYMENTS TO ESCROW | | DISBURSEMENTS FROM ESCROW | | DESCRIPTION | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|
| | PROJECTED | ACTUAL | PROJECTED | ACTUAL | | PROJECTED | ACTUAL |
| | | | | | BEGINNING BALANCE | 953.19 | -33,690.44 |
| 12/14 | 953.19 | * | | | | 1,906.38< | -33,690.44< |
| 01/15 | 953.19 | * | | | | 2,859.57 | -33,690.44 |
| 02/15 | 953.19 | 902.67* | | | | 3,812.76 | -32,787.77 |
| 03/15 | 953.19 | * | | | | 4,765.95 | -32,787.77 |
| 04/15 | 953.19 | 29,355.89* E | | E | | 5,719.14 | -3,431.88 |
| 05/15 | 953.19 | * | | | | 6,672.33 | -3,431.88 |
| 06/15 | 953.19 | * | 2,291.00 | * | HOME INS | 5,334.52 | -3,431.88 |
| 07/15 | 953.19 | * | | | | 6,287.71 | -3,431.88 |
| 08/15 | 953.19 | * | | | | 7,240.90 | -3,431.88 |
| 09/15 | 953.19 | * | | | | 8,194.09 | -3,431.88 |
| 10/15 | 953.19 | * | | | | 9,147.28 | -3,431.88 |
| 11/15 | 953.19 | * | | | | 10,100.47 | -3,431.88 |

Under Federal Law (RESPA) the lowest monthly balance in your escrow account should not exceed $1,906.38 or 1/6th of the total anticipated annual disbursement from your escrow account, unless your mortgage documents or state law specifies a lower amount. When your escrow balance reaches its lowest point during the account cycle, that balance is targeted to be your cushion amount. Under the Mortgage Contract or State or Federal Law, the targeted low point in your escrow account is $1,906.38 and the actual low point balance was -$33,690.44; the amount is indicated with an arrow (<).

Wake County,NC   1582
Laura M Riddick, Register Of Deeds

Presented & Recorded 06/28/2002 16:15:45

Book : 009476   Page : 02654 - 02677

Return To: WELLS FARGO HOME MORTGAGE, INC.
    3601 MINNESOTA DR. SUITE 200, BLOOMINGTON, MN 55435
Prepared By: WELLS FARGO HOME MORTGAGE, INC.

    ,, GREENSBORO, NC   274010000
    ——————————————[Space Above This Line For Recording Data]——————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JUNE 28, 2002
together with all Riders to this document.

(B) "Borrower" is SAM B LUCCHESE AND JENNIFER W LUCCHESE, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.

(C) "Lender" is WELLS FARGO HOME MORTGAGE, INC.

Lender is a CORPORATION
organized and existing under the laws of THE STATE OF CALIFORNIA

NORTH CAROLINA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3034  1/01

-6(NC) (0110)
Page 1 of 15
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is P.O. BOX 5137, DES MOINES, IA  503065157

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is JOHN H KORNEGAY
314 NORTH CHURCH ST, GREENSBORO, NC  27401

(E) "Note" means the promissory note signed by Borrower and dated JUNE 28, 2002
The Note states that Borrower owes Lender FOUR HUNDRED FORTY SEVEN THOUSAND NINE
HUNDRED TWENTY AND 00/100                                                      Dollars
(U.S. $***447,920.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than JULY 01, 2032

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

-6(NC) (0110)                            Page 2 of 15                    Form 3034   1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the COUNTY                                of WAKE                                                    :
              [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

See Exhibit A attached hereto and incorporated herein for a more complete and accurate description.

*SEE ADJUSTABLE RATE RIDER

Parcel ID Number:                                                which currently has the address of
2904 LAKE BOONE PL                                                                              [Street]
RALEIGH                                                    [City], North Carolina 27608    [Zip Code]
("Property Address"):

    TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any

-6(NC) (0110)                          Page 3 of 15                          Initials            Form 3034    1/01

prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 then Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to

prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any

-6(NC) (0110)                          Page 6 of 16                    Initials: _____    Form 3034  1/01

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement

-6(NC) (0110)                                    Page 8 of 15                                    Form 3034  1/01

provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time.

Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects

-6(NC) (0110)                         Page 11 of 15                    Initials: [signature]         Form 3034   1/01

Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.000 % of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Attorneys' Fees.** Attorneys' fees must be reasonable.

Initials: _____

-6(NC) (0110)                    Page 13 of 16                    Form 3034    1/01

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                    SAM B LUCCHESE                    -Borrower

_____    _____ (Seal)
                                    JENNIFER W. LUCCHESE             -Borrower

_____ (Seal)    _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)    _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)    _____ (Seal)
                           -Borrower                                 -Borrower

 -6(NC) (0110)                Page 14 of 15              Form 3034  1/01

STATE OF NORTH CAROLINA,                    Wake                    County ss:
    I, Robert J. Ramseur, Jr.
a Notary Public of the County of    Wake                , State of North Carolina, do hereby
certify that SAM B LUCCHESE AND JENNIFER W LUCCHESE

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.
    Witness my hand and official seal this    28th        day of   June,  2002

My Commission Expires: 7-9-2006

_____
Notary Public

STATE OF NORTH CAROLINA,                                        County ss:
    The foregoing certificate of
a Notary Public of the County of                , State of
is certified to be correct.
    This            day of

Registrar of Deeds

By _____
   Deputy Assistant

-6(NC) (0110)                    Page 16 of 15                    Form 3034   1/01


HAKE COUNTY, NC   1
LAURA M RIDDICK
REGISTER OF DEEDS
PRESENTED & RECORDED ON
04/28/2014 AT 08:33:55

BOOK:015641 PAGE:00881 - 00883

Record and Return To:  Box 261
JPMorgan Chase Bank, N.A.
780 Kansas Lane, Suite B
Monroe, LA  71203

Prepared By: Scott Sykes
BORROWER: Sam B Lucchese And Jennifer W Lucchese, Husband And Wife
LOAN NO.:

## ASSIGNMENT OF DEED OF TRUST

That, **EMC Mortgage LLC f/k/a EMC Mortgage Corporation, 2780 Lake Vista Drive, Lewisville TX 75067,**
hereinafter designated as Assignor for valuable consideration in an amount of not less than outstanding principal  amount
plus accrued and unpaid interest, the receipt whereof  is hereby acknowledged, does by the presents hereby grant,
bargain, sell, assign, transfer and set over to:

CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY,

FSB, AS TRUSTEE FOR NORMANDY MORTGAGE LOAN TRUST, SERIES 2013-10 at 1610 E. St. Andrew Pl, Ste # B-150, Santa Ana, CA 92705
hereinafter designated as Assignee, all of it rights, title and interest, as holder thereof, in and to the following described
lien in the form of a mortgage or deed of trust, the property therein described and the indebtedness thereby secured:

**DEED OF TRUST:**
Executed by:   Sam B Lucchese And Jennifer W Lucchese, Husband And Wife
Payable to:    Wells Fargo Home Mortgage, Inc.
Trustee:       John H Kornegay
Note dated:    6/28/2002        Original Principal Amt: $447,920.00
Recorded on:   6/28/2002        BK: 009476  PG: 02654-02677 Instr: N/A
County of:     Wake             State of:  NC
Property Add: 2904 Lake Boone Pl., Raleigh, NC 27608
Legal:   Being all of Lot No. 10, LAKE BOONE PLACE SUBDIVISION, as shown on map recorded in Book of
Maps 1985, Page 30, Wake County Registry.

BK015641PG00882

**PAGE TWO**

BORROWER: Sam B Lucchese And Jennifer W Lucchese, Husband And Wife
LOAN NO.: ▮▮▮▮▮▮▮▮

Together with the note or obligation described in said mortgage, endorsed to the Assignee this date and all money due to and become due thereon, with interest. The Assignee is not acting as nominee of the mortgagor and that the mortgage continues to secure a bonafide obligation. This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an Assignment within the Secondary Mortgage Market

**TO HAVE AND TO HOLD** the same unto Assignee and to the successors, legal representatives and assigns to the Assignee forever, and Assignor hereby constitute and appoints said Assignee its attorney irrevocable to collect and receive said debt, and to foreclose, enforce, and satisfy said lien the same as it might or could have done were these presents not executed, but at the cost and expense of the Assignee, subject however to the right and equity of redemption, if any there be, of the maker(s) of the mortgage or deed of trust herein above described

**Date: 5/15/2012**

**EMC Mortgage LLC f/k/a EMC Mortgage Corporation**

_____
**Scott Sykes, Vice President**

**STATE OF LOUISIANA**
**COUNTY OF OUACHITA**

On this day, **5/15/2012,** before me,                          -**Notary Public,** personally came **Scott Sykes** to me known, who, being duly sworn, did depose and say that he/she resides at **780 Kansas Lane, Suite B, Monroe, Louisiana 71203** that he/she is the **Vice President of EMC Mortgage LLC f/k/a EMC Mortgage Corporation,** the corporation described in and which executed this foregoing instrument: and that he/she signed his/her name by authority of the Board of Directors of said corporation.

_____  -**Notary Public**
NORMA WOODALL
**ID:** 64293
**Commission expires:  Lifetime**



BOOK:015641 PAGE:00881 - 00883



# WAKE COUNTY
## NORTH CAROLINA

---

## Please retain yellow trailer page
**It is part of the recorded document and must be submitted with the original for re-recording.**

---

# Laura M. Riddick
# Register of Deeds

**Wake County Justice Center**
**300 South Salisbury Street, Suite 1700**
**Raleigh, NC  27601**

☐ New Time Stamp                      ☐ $25 Non-Standard Fee

☐ Additional Document Fee             ☐ Additional Reference Fee

**This Customer Group**              **This Document**

_____ # of Time Stamps Needed        ___3___ # of Pages 4

# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| JUNE 28, 2002 | RALEIGH | NORTH CAROLINA |
|---|---|---|
| [Date] | [City] | [State] |

2904 LAKE BOONE PL, RALEIGH, NC  27608

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ *****447,920.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is WELLS FARGO HOME MORTGAGE, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  6.125           %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on AUGUST 01, 2002. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 01, 2032          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at WELLS FARGO HOME MORTGAGE, INC., P.O. BOX 5137, DES MOINES, IA  503065157

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ *2,721.61          . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JULY, 2007          , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family - Fannie Mae UNIFORM INSTRUMENT



The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-QUARTERS          percentage points ( 2.750          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.125          % or less than 2.750          %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.125          %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   **BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.   **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.   **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.   **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:



**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Form 3522 1/01

Initials:

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
SAM B LUCCHESE          -Borrower          JENNIFER W LUCCHESE          -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

*[Sign Original Only]*

WITHOUT RECOURSE
PAY TO THE ORDER OF

EMC MORTGAGE CORPORATION

WELLS FARGO HOME MORTGAGE, INC.
By _____
        Joan M. Mills,
        Vice President

-843N (0005)                  Page 5 of 5                  Form 3622 1/01

### Allonge to Note

Loan #:          ▇▇▇▇▇▇
· Borrower:     SAM B LUCCHESE AND JENNIFER W LUCCHESE
Address:        2904 LAKE BOONE PL
                RALEIGH NC 27608

Loan Amount: $447,920.00

Allonge to one certain note dated June 28, 2002 and executed by SAM B LUCCHESE AND JENNIFER W LUCCHESE.

Pay to the order of _____ its successor and/or assigns without recourse in any event.

Without recourse

EMC Mortgage LLC f/k/a EMC Mortgage Corporation

_____ *Scott S* _____

Type / Printed Name of Signor:  SCOTT SYKES
Type / Printed Title of Signor:   VICE PRESIDENT

Loan No. ▮▮▮▮▮    Data ID: ▮▮▮
Borrower:   SAM LUCCHESE

## LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]:  SAM LUCCHESE AND JENNIFER LUCCHESE

Lender ("Lender"): EMC Mortgage Corporation ("EMC"), as servicer for EMC Mortgage Corporation Mortgagee ("Mortgagee")

Date of First Lien Security Instrument ("Mortgage") and Note ("Note"): June 28, 2002, in the amount of $447,920.00

Loan Number: ▮▮▮▮▮ ("Loan")

Property Address: 2904 LAKE BOONE PL., RALEIGH, NORTH CAROLINA  27608 ("Property")

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as 'I'. For purposes of this document words signifying the singular (such as 'I') shall include the plural (such as 'we') and vice versa where appropriate.

LOAN MODIFICATION AGREEMENT                                                    WF101

*(Page 1 of 6 Pages)*

Loan No: ███████                                                    Data ID: ███ 

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (1) the Mortgage on the Property, dated June 28, 2002 in the original amount of $447,920.00, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents". Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement. This Agreement will not take effect unless and until the Lender signs it.

1.  **My Representations.** I represent to Lender and agree:
    A. I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent;
    B. The Property I live in is neither in a state of disrepair, nor condemned;
    C. There has been no change in the ownership of the Property since I signed the Loan Documents;
    D. I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action;
    E. I have provided documentation for all income that I earn; and
    F. All documents and information I provide pursuant to this Agreement are true and correct.

2.  **The Modification.** The Loan Documents are hereby modified as of April 14, 2010 (the "Modification Effective Date") and all unpaid late charges are waived. The Lender agrees to cease any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement. The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:
    A. The Maturity Date will be: May 1, 2050.
    B. The modified principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges), and may include amounts toward taxes insurance or other assessments. The new principal balance of my Note is $481,694.39 (the "New Principal Balance").
    C. The New Principal Balance will re-amortize over 480 months.

    Interest will begin to accrue as of May 1, 2010. The first new monthly payment on the New Principal Balance will be due on June 1, 2010, and monthly on the same day thereafter.

    My payment schedule for the modified loan is as follows:

Loan No: ▓▓▓▓                                                    Data ID: ▓▓▓

<u>TEMPORARY INTEREST ONLY PERIOD.</u>  I promise to pay monthly payments according to the following schedule with respect to the New Principal Balance:

| Years | Interest Rate | Interest Rate Change Date | Monthly Interest Only Payment Amount | Monthly Principal and Interest Payment Amount | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|--------------------------------------|-----------------------------------------------|-------------------|----------------------------|
| 1-5   | 5.000         | 05/01/10                  | $2,007.07                            | N/A                                           | 06/01/10          | 60                         |
| 6-40  | 5.000         | 05/01/15                  | N/A                                  | $2,431.05                                     | 06/01/15          | 420                        |

ONCE THE INTEREST ONLY PERIOD EXPIRES, BORROWER WILL MAKE MONTHLY PAYMENTS OF PRINCIPAL AND INTEREST AS INDICATED ABOVE FOR THE SPECIFIED TIME PERIODS.  BEGINNING June 1, 2015, THE MONTHLY PAYMENT WILL BE A FULLY AMORTIZED PRINCIPAL AND INTEREST PAYMENT.  Whenever the monthly payment amount changes, Lender will notify Borrower of the new payment amount prior to the date it first becomes due.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan Documents, including but not limited to provisions for an adjustable or step interest rate.

D. I agree to pay in full any other amounts still owed under the Loan Documents, by the earliest of the date I sell or transfer an interest in the Property, subject to Section 3.E below, the date I pay the entire New Principal Balance, or the Maturity Date.

E. I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement.  If a default rate of interest is permitted under the current Loan Documents, then in the event of default, the interest that will be due on the New Principal Balance will be the rate set forth in Section 2.C.

LOAN MODIFICATION AGREEMENT                                    WF101
                                                       (Page 3 of 6 Pages)

Loan No: ▓▓▓▓▓                                                      Data ID: 

3.  **Additional Agreements.** I agree to the following:

    A.  That this Agreement shall supersede the terms of any modification, forbearance or workout plan, if any, that I previously entered into with Lender.

    B.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, impounds, and all other payments, the amount of which may change periodically over the term of my Loan. This Agreement does not waive future escrow requirements. If the Loan includes collection for tax and insurance premiums, this collection will continue for the life of the Loan.

    C.  That the Loan Documents are composed of valid, binding agreements, enforceable in accordance with their terms are hereby reaffirmed.

    D.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

    E.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

    F.  That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

Loan No ▓▓▓▓▓▓▓▓▓▓                                                    Data ID: ▓▓▓▓▓

G. If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H. All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I. If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

J. That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement. If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

LOAN MODIFICATION AGREEMENT                                                    WF101
                                                                    (Page 5 of 6 Pages)

Loan No: ▓▓▓▓                                                    Data ID: ▓▓▓▓

In Witness Whereof, the Lender and I have executed this Agreement.

Date: _____ 04 / 19 / 2010 _____

_____
SAM LUCCHESE —Borrower

_____
JENNIFER LUCCHESE —Borrower


Lender: EMC MORTGAGE CORPORATION, as servicer for EMC
Mortgage Corporation

By: _____

Its: _____
                    STEVE CROWELL
                    VICE PRESIDENT                    (Title)

LOAN MODIFICATION AGREEMENT                                    WF101
                                                          (Page 6 of 6 Pages)

Loan No: [redacted]
Borrower: SAM LUCCHESE     Claim 11   Filed 08/04/15   Desc Main Document   Page 41 of [redacted]

## COMPLIANCE AGREEMENT

In consideration of EMC MORTGAGE CORPORATION, as servicer for EMC Mortgage Corporation ("Lender") extending funds (the "Loan"), in connection with the closing of the property located at

2904 LAKE BOONE PL.
RALEIGH, NORTH CAROLINA  27608                                    (the "Closing"),

the undersigned ("Borrower") agrees, upon request of Lender, its successors or assigns ("Note Holder"), or upon request of any person acting on behalf of Note Holder, to fully cooperate with Note Holder or such person to correct any inaccurate term or provision of, mistake in, or omission from any document associated with the Closing. Borrower further agrees to execute such documents or take such action as Note Holder or such person acting on behalf of Note Holder reasonably may deem necessary (including without limitation the correction of any such inaccuracy, mistake, or omission) as will enable Note Holder to sell, convey, seek guaranty of, or market the Loan to any entity, including without limitation an investor, the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Department of Veterans Affairs, or any bonding authority.

Borrower further agrees to comply with any such request within a reasonable period of time as specified by Note Holder or by such person acting on behalf of Note Holder.  Failure to comply shall constitute default under the Note and Security Instrument that evidence the Loan, and Note Holder may pursue its available remedies.

BY SIGNING BELOW BORROWER ACKNOWLEDGES THAT BORROWER FULLY UNDERSTANDS THIS COMPLIANCE AGREEMENT OR OTHERWISE HAS SOUGHT THE ADVICE OF COUNSEL.

Date: _04 / 19 / 2010_

_____
SAM LUCCHESE —Borrower

_____
JENNIFER LUCCHESE —Borrower



### Trial Modification Plan

Re:    Borrower(s):    **SAM LUCCHESE JENNIFER LUCCHESE**
       Property:       **2904 LAKE BOONE PL, RALEIGH, NC 27608**
       Loan#:          **.0865**

Borrower executed a promissory note (the "Note") and Mortgage/Deed of Trust/Deed to Secure Debt ("Security Instrument") on **6/28/2002** in the amount of **$447,920.00** (the "Loan").

The Property secures the Loan.

Borrower is in default under the terms of the Note and Security Instrument.

In consideration of the benefits which Borrower and the holder of the Note and Security Instrument (the "Lender") may obtain by entering into this Trial Modification Plan (the "Agreement") and for other good and valuable consideration, Borrower and Selene Finance LP ("Selene"), on behalf of the Lender, agree to the following:

## TRIAL MODIFICATION PLAN

**Borrower agrees to make payments in the amounts shown below on or before the date specified for each payment. Payments will be applied as specified below.**

| Date | Payment Amount | Applied To |
|------|----------------|------------|
| 2/1/2015 | $2,980.31 | Suspense |
| 3/1/2015 | $2,980.31 | Suspense |
| 4/1/2015 | $2,980.31 | Suspense |

## YOUR OBLIGATIONS UNDER THIS TRIAL MODIFICATION PLAN

### PAYMENTS

The initial down payment under this Agreement must be made with certified funds. This can be done by sending a money order or certified bank check to: Selene Finance, 9990 Richmond Avenue, Ste. 400 South, Houston, TX 77042, or send a Money Gram payment using code "**6440**". The initial down payment must be received no later than 3:00 pm central time on the above down payment date. It is your responsibility to maintain records evidencing delivery of any and all payments, including the down payment. Please include the loan number as reference for posting. In addition to the down payment, you must make the monthly payments on or prior to the dates stated above in the Trial Modification Plan Section. Failure to make timely payments shall constitute a default under this Agreement and the Agreement may be void, with Selene having no obligation to offer another Trial Modification Plan.

**This Agreement is NOT designed to cure the default and bring the Loan current. It is specifically designed to implement a short term and temporary repayment plan period. During this repayment plan period, Borrower will make the payments shown above, which will be applied in accordance with the schedule outlined above.**

**If Borrower makes each of the payments as set forth in this Agreement and, if applicable, provides Selene with the financial information described below, Selene, on behalf of the Lender, will offer a permanent modification of the Loan and may assist the Borrower in refinancing the Loan. Borrower authorizes Selene to share information about the loan and Borrower's financial information with lenders who may offer Borrower a new loan.**

Trial Modification Plan
Page 2 of 6
CL101
       **0865**

Initial _[signatures]_



EXHIBIT
B
Blumberg No. 5119

**REQUIRED INFORMATION, CONDITIONS.**

**Borrower agrees to give Selene's representative access to the property to perform an interior Broker Price Opinion at least 30 days prior to the final payment date shown above. If the Borrower does not allow access to complete the inspection within that timeframe, this Agreement will be void, and Selene will have no obligation to offer another Trial Modification Plan. Moreover, Selene and the Lender may exercise all its rights under the Note and Security Instrument.**

**In the event the property is presently insured by Lender under a "lender placed insurance policy", then Borrower shall obtain his/her/their own homeowner's insurance policy, naming Lender as an additional insured, pursuant to the obligations under the Security Instrument.**

**If Borrower is approved for a modification, Selene will establish (if Borrower does not already have one) and maintain an escrow account for the payment of property taxes, homeowners insurance and, if applicable, flood insurance. There will be no initial cost for establishing the account. Your signature below indicates your acceptance of the establishment and maintenance of the escrow account by Selene.**

**FORECLOSURE NOT DISMISSED**

This Agreement is not a permanent resolution of the default under the Note and Security Instrument. **IN THE EVENT THAT A FORECLOSURE IS PENDING, THE FORECLOSURE ACTION WILL NOT BE DISMISSED OR RESCINDED.** However, while your loan is under review for modification and so long as you remain current under the terms of this Agreement, the foreclosure will be placed on hold for the term of the Trial Modification Plan. If Borrower defaults under the terms of the Agreement, the Agreement shall be deemed void, and Selene may proceed with the pending foreclosure without further notice to Borrower.

**CHANGE IN FINANCIAL CONDITION**

Borrower agrees that upon 30-days written notice, Selene has the right to increase the monthly payment required under this Agreement if Selene has verified that:

- There has been a material change in Borrower's financial condition; or
- There were significant inaccuracies in the financial information last submitted by Borrower, and that Borrower is financially able to make increased payments.

**ADJUSTABLE RATE NOTE**

This Agreement does not alter the manner in which interest is calculated under the Note on an Adjustable Rate Mortgage Loan, or the obligation to pay any interest that accrues during the Trial Modification Plan. While this Agreement is in effect, the Note will continue to govern the rate at which interest accrues on the loan balance and how the loan balance is calculated. If interest accrues under the Note at a rate that is subject to periodic adjustments due to changes in an Index (an adjustable rate mortgage), this Agreement does not limit or alter the manner in which that rate may change.

Therefore, if there is an increase in the Index Rate under the Note during the Trial Modification Plan, interest will accrue on the loan balance during the Trial Modification Plan at the increased rate. However, your payments under this Agreement will not change with any increase or decrease to the Index Rate. While this Agreement is in effect, you may continue to make payments in the amounts detailed in this Agreement without regard to how the Index Rate may adjust under the terms of your Note.

Initials

## TERMINATION CONDITIONS

This Agreement is automatically terminated under any of the following circumstances:

- The Property is abandoned or left vacant for more than sixty (60) days.
- Borrower no longer uses the Property as a principal residence unless Borrower can evidence a temporary relocation by the primary employer or, if the borrower is an active duty service member in the Armed Services of the United States or a state's National Guard, is assigned to a new post.
- Borrower transfers ownership or interest in the Property without consent of Selene.
- Selene received incorrect information in connection with the Borrower executing this Agreement.
- Borrower fails to meet any of the terms of this Agreement or the original Note and Security Instrument.
- Borrower files bankruptcy.

## Credit Reporting

During the Trial Modification Plan, Lender will report the Loan to the appropriate reporting agencies. This report will contain the contractual delinquency status with the comment "Paying under a Partial Agreement". If this Agreement is breached for non-payment, Lender will resume reporting your Loan as delinquent.

## Original Note and Security Instrument

All of the provisions of the Note and Security Instrument, except as provided in this Agreement, remain in full force and effect. Nothing contained in this Agreement will be construed to impair the Security Instrument or effect or impair the Lender's rights or powers under the Note and Security Instrument. This Agreement does not constitute a waiver of the Lender's right to insist upon strict performance in the future.

The offer contained in this Agreement expires and is withdrawn unless this Agreement is executed by each Borrower and received by Selene by the down payment date and the down payment is made in accordance with the terms of this Agreement.

Date: _01 · 09 · 2015_          _____
                                Borrower

                                _____
                                Co-Borrower

**You may return the signed and initialed Agreement to one of the following:**

**Selene Finance**
**P.O. Box 422039**
**Houston, TX 77242-4239**
**Fax: (866) 926-5498**
**Email: loanresolution@selenefinance.com**

Re:  Customer(s):  **SAM LUCCHESE JENNIFER LUCCHESE**
     Property Add:  **2904 LAKE BOONE PL, RALEIGH, NC 27608**
     Loan#:         **)865**

Trial Modification Plan
Page 4 of 6
CL101
**0865**

Initials

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

SAM BERNARD LUCCHESE, III,              CASE NO. 15-01781-5-SWH
                                        CHAPTER 13

      DEBTOR

## NOTICE OF OBJECTION TO CLAIM

     NOTICE IS HEREBY GIVEN to the creditor/claimant named above that if no response to the Objection to Amount of Claim is filed in writing with the CLERK, U.S. BANKRUPTCY COURT, PO Box 791, RALEIGH, NC 27602, within thirty (30) days of the date of this objection and notice, the relief requested by the debtor herein maybe granted without hearing or further notice. Any party desiring a hearing must request a hearing in writing with the above clerk within the time herein set forth; otherwise no hearing will be conducted unless the Court, in its discretion, directs that a hearing be set. If a hearing is requested, such hearing will be conducted at a date, time, and place to be later fixed by the Court and the parties requesting such a hearing will be notified accordingly. Any party filing a response and requesting a hearing shall attend the hearing or costs may be assessed against him.

     Dated: September 24, 2015.

                              SASSER LAW FIRM

                              By: s/ Travis Sasser
                              Travis Sasser, State Bar No. 26707
                              2000 Regency Parkway, Suite 230
                              Cary, N.C. 27518
                              Tel: 919.319.7400
                              Fax: 919.657.7400

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Objection to Claim and Notice of Objection to Claim was served on the entities listed below at their last known address with sufficient postage thereon, or, if such interested party is an electronic filing user, by serving such interested party, electronic transmission, pursuant to Local Rule 5005-4(9)(b).

Trustee
*Served Electronically*

Selene Finance, LP
Attn: Managing Agent
9990 Richmond Ave., Ste. 400S
Houston, TX 77042

Selene Finance, LP
c/o Alison H. Wadsworth, Esq.
Shapiro & Ingle, L.L.P.
10130 Perimeter Parkway, Suite 400
Charlotte, NC 28216
*(Attorney of Record (Doc 9))*

Sam Lucchese, III
2904 Lake Boone Place
Raleigh, NC 27608

I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 24, 2015.

SASSER LAW FIRM

By: s/ Travis Sasser
Travis Sasser, State Bar No. 26707
2000 Regency Parkway, Suite 230
Cary, N.C. 27518
Tel: 919.319.7400
Fax: 919.657.7400